IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PATRICIA KING                        )
                                     )
v.                                   )       No. 3:12-0753
                                     )       Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION       )


To:    The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits and supplemental security income, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 7), to which defendant has responded (Docket Entry No. 10). Plaintiff has further filed a reply brief (Docket Entry No. 13), to which defendant has filed a sur-reply (Docket Entry No. 16). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 5),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I.  Introduction

Plaintiff filed her claims to benefits on July 8, 2008, alleging that she became disabled on January 1, 2008, as a result of her bipolar disorder.  (Tr. 161, 171-72)  Her claims were denied at the initial and reconsideration stages of state agency review, whereupon plaintiff filed a request for de novo hearing and decision by an Administrative Law Judge (ALJ).  An administrative hearing was held on June 15, 2010, at which plaintiff appeared with counsel.  (Tr. 24-51)  Plaintiff testified, as did an impartial vocational expert.  At the conclusion of the hearing, the ALJ closed the record and took the matter under advisement, until September 2, 2010, when he issued a written decision in which plaintiff was found to be not disabled.  (Tr. 11-19)  That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (AOD) (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: bipolar disorder, major depressive disorder, and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (RFC) to perform a full range of work at all exertional levels.  From a mental standpoint, the claimant is able to understand, remember, and carry out routine step instructions.  She is able to respond appropriately to supervisors and coworkers in jobs that do not require independent decision making.  The claimant has the mental capacity to perform work where interpersonal contact is only incidental to work

performance.

6.      The claimant is capable of performing past relevant work as a hand packer.
        This work does not require the performance of work-related activities
        precluded by the claimant's residual functional capacity (20 CFR 404.1565 and
        416.965).

7.      The claimant has not been under a disability, as defined in the Social Security
        Act, from January 1, 2008, through the date of this decision (20 CFR
        404.1520(f) and 416.920(f)).

(Tr. 13-15, 18-19)

         On July 17, 2010, the Appeals Council denied plaintiff's request for review of
the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the
Administration.  This civil action was thereafter timely filed, and the court has jurisdiction.
42 U.S.C. §§ 405(g), 1383(c).  If the ALJ's findings are supported by substantial evidence,
based on the record as a whole, then those findings are conclusive.  Id.

## II.  Review of the Record

         The following summary of the record is taken from defendant's brief, Docket
Entry No. 10 at 3-11.

### 1. Non-Medical and Vocational Evidence

         As of January 1, 2008, Plaintiff's alleged onset date, she was 30 years old, which is
considered a younger individual (Tr. 161). See 20 C.F.R. §§ 404.1563(c), 416.963(c). She
stopped working on June 28, 2008, "[b]ecause of other reasons (not my condition) can't keep
a job for a long periods" [sic] (Tr. 173). Plaintiff married on December 17, 2008 and has
completed 2 years of college courses (Tr. 27-28, 32-33, 178). She attended college at the time

she applied for benefits through the beginning of 2010 (Tr. 178). Plaintiff has a driver's license and is able to drive (Tr. 32-33). She has never been fired from a job and has worked as a fountain server, animal control officer, and a hand packer (Tr. 40, 181-182).

Plaintiff completed a Function Report - Adult on July 27, 2008, indicating she engages in a variety of daily activities ranging from taking care of pets, housework, social activities, errands, providing transportation to and from work for a friend, photography, personal care, cooking, baking, driving shopping, walking, taking care of personal finances, watching t.v., and studying (Tr. 212-216). She indicated her impairment affects her ability to concentrate, understand, and get along with others (Tr. 217). She can walk for a half mile before needing to take a 20 minute rest. Id. Plaintiff indicated she can read 2 to 3 paragraphs at a time, she can follow written instructions but it takes her time, and she can follow spoken instructions but does better with written ones. Id. Plaintiff states she does not handle stress well (Tr. 218).

Plaintiff submitted a Disability Report - Appeal on December 12, 2008, alleging Plaintiff "reports suffering from severe insomnia, severe depression, feelings of isolation, crying spells, confusion, hallucinations and delusions" since Fall 2008 (Tr. 227-232). Plaintiff "reports that she has trouble functioning in social situations, and suffers from severe bouts of anxiety when placed in such situations" also since Fall 2008 (Tr. 228). She did not report any new impairments. Id. Plaintiff "indicates that she is affected to the extent that activities requiring social interaction are extremely difficult" but there were no changes in her daily activities since she filed the report in September 2008 (Tr. 231).

## 2. Medical Evidence

### a. Physical Health

The record includes an unsigned Memorandum dated May 6, 2010, that indicates that in 2001 Plaintiff was assessed with chronic plantar fasciitis/heel spur syndrome confirmed by radiographs (x-rays), which was treated by casting orthotics, placing Plaintiff in bilateral low Dye strappings, and placing heel lifts in her shoes (Tr. 454). However, the record does not include copies of the radiographs, nor is there any indication of who wrote the letter or who provided services, though the fax appears to have been generated from Mid State Podiatry.

### b. Mental Health

#### i. Treating Physician and Medication Management

Dr. Christopher Raggio was Plaintiff's treating psychiatrist from September 17, 2007, through April 27, 2009 (Tr. 277-292, 341-346, 429-443). On September 17, 2007, he noted that Plaintiff's affect, speech and thought processes, memory and orientation were all normal and she had a normal range of affect (Tr. 277). Dr. Raggio diagnosed Bipolar disorder, NOS on Axis I and deferred on Axis II (Tr. 277). He also indicated she had moderate issues in occupational, economic, and education and severe issues with access to health care and family/primary support on Axis IV. Id.

Over the course of Plaintiff's treatment, Dr. Raggio assessed her Global Assessment of Functioning (GAF) as fluctuating between 50 and 60. Between October 2007 and June 2008, and between December 2008 and July 2009, Plaintiff's GAF has been assessed between 51-60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 279, 282-290, 436-444, 531). See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, American Psychiatric Association, (2000)(DSM-IV-

TR), p. 34. Plaintiff's GAF remained at a 60 despite reporting that she had stopped taking her medications in January 2009 (Tr. 525). Plaintiff's GAF was assessed by Dr. Raggio as 50 (indicating serious symptoms or any serious impairment in social, occupational, or school functioning) upon initial assessment in September 2007 (Tr. 277). See DSM-IV-TR, p. 34. He also assessed her GAF as 50 during the period between June 2008 and December 2008, when she stopped working, she could not pay rent and she lost her apartment, she was taking college courses, and she stopped taking two of the medications Dr. Raggio prescribed (Tr. 282-292, 341-346). Plaintiff stopped taking her Trazodone because it did not help her sleep and stopped her Lamictal, prescribed for mood stabilization, because it made her "sick" if she took her cholesterol medication (Tr. 345).

On July 20, 2009, Plaintiff was treated by Dorothy Burke, MSN APRN BC (Tr. 534). Plaintiff reported that she stopped taking the Depakote (valproic acid) prescribed by Dr. Raggio 1.5 months beforehand. Id. Ms. Burke noted "Long hx of noncompliance" (Tr. 533). Plaintiff reported feeling stressed due to getting married, her husband was hurt in a motorcycle accident, she was taking care of her husband, she had anger outbursts due to frustration and she was not sleeping well. Id. Ms. Burke opined Plaintiff was slow to respond, being dramatic, and not tracking the conversation. Id. Ms. Burke lowered Plaintiff's GAF to 45, prescribed Geodon, and scheduled Plaintiff to return for follow up in eight (8) weeks (Tr. 535).

Ms. Burke treated Plaintiff again on October 22, 2009, when Plaintiff reported sleeping better, she was concentrating and focused when dealing with school, but she was not being social (Tr. 535). Ms. Burke continued Plaintiff's Geodon and increased her GAF to 50 (Tr. 536).

The last time Ms. Burke treated the Plaintiff was on February 22, 2010, when Plaintiff reported that she was in school, living with her husband but she was not in therapy and did not have a case manager (Tr. 537). Ms. Burke noted that Plaintiff should have been taking Geodon and recommended lithium going forward (Tr. 537, 538). However, Plaintiff objected to lithium because she wanted to have children (Tr. 538). Ms. Burke referred the Plaintiff to the Emergency Room (ER) for more intense monitoring while starting lithium. Id.

### ii. Medical Expert Assessments

On September 9, 2008, after reviewing Plaintiff's treatment with Dr. Raggio, State agency psychological consultant[1] (PC) Frank D. Kupstas, Ph.D., completed a Psychiatric Review Technique form (PRTF) to assess whether Plaintiff's impairment met or equaled Listing 12.04 and a Mental Residual Functional Capacity Form (MRFC) (Tr. 317-334). Dr. Kupstas determined that Plaintiff's impairment did not meet the diagnostic criteria for either a full or partial manic or depressive syndrome (Tr. 320). He also determined that Plaintiff's impairment resulted in mild restriction of activities of daily living (ADLs) and difficulties in maintaining social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation, each of extended duration (Tr. 327). He determined that the medical evidence did not establish the presence of the "C" criteria (Tr. 328). Ultimately, he determined that Plaintiff was able to sustain concentration, persistence, or pace over extended periods for simple tasks and detailed tasks but she would have some difficulty with detailed tasks at times (Tr. 333).

On September 25, 2008, State agency consultant Andrew J. Phay, Ph.D., also completed a PRTF and MRFC to assess whether Plaintiff's impairment met Listing 12.04 (Tr. 347-364). He also determined that Plaintiff's impairment did not meet the diagnostic criteria

for either a full or martial manic or depressive syndrome and determined that Plaintiff's impairment resulted in mild restriction of activities of daily living (ADLs) and difficulties in maintaining social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation, each of extended duration (Tr. 350, 357). He determined that the medical evidence did not establish the presence of the "C" criteria (Tr. 358). He opined that the Plaintiff "appears LIKELY TO HAVE SOME BUT NOT SUBSTANTIAL DIFFICULTY to [sic] maintain concentration, perform routine daily activities and complete a normal work week with acceptable performance/productively" (emphasis original)(Tr. 363).

### iii. Therapy

On September 7, 2007, Plaintiff was assessed by Cheryl Neal from Volunteer Behavioral Health Care System (VBHCS) (Tr. 267- 271). Plaintiff reported being diagnosed with bipolar disorder by a psychiatrist but could not recall the psychiatrist's name (Tr. 267). She reported "feeling depressed, avolition, poor concentration, anhedonia, lonely, having crying spells, and 'sometimes I crave to be around people, sometimes not.'" Id. Ms. Neal noted that "[s]he demonstrates clipped pressured speech with occasional slurred words, racing thoughts, anger, initial insomnia and premature wakenings with up to 3-4 hrs sleep/night." Id. Plaintiff denied elevated mood. Id. Plaintiff reported alternating between being a full-time and a part-time college student (Tr. 268). The mental status exam shows Plaintiff appeared casual; speech was pressured, orientation was no problem, affect was labile, sad, and angry; behavior was agitated, guarded, hostile, and withdrawn; thought content was normal; mood depressed; psychomotor was appropriate; recent memory was good; remote memory was good; concentration was fair; her level of insight was limited; insight rating was poor; judgment level was limited; judgment rating was fair; impulse level

was limited; and her impulse rating was fair (Tr. 269). The risk Assessment shows that Plaintiff had suicidal ideation but was assessed as a low suicide risk (Tr. 270).

Plaintiff's next and last appointment with Ms. Neal was not until May 20, 2008, when Ms. Neal assessed Plaintiff as guarded, defensive, and her speech was noted as tangential with frequent derailment (Tr. 273). Plaintiff indicated that she wanted to use therapy as "a place to rant and rave" and that "she does not want to change, nothing can be changed." Id. Ms. Neal did not schedule a follow up session but "suggested that when [Plaintiff] felt ready to engage in the process of personal insight and change, [Ms. Neal] would be available for her." Id.

On July 17, 2008, Plaintiff attended an individual therapy session with Diana Frances, LCSW, who noted Plaintiff's affect was irritable, angry, and sad; and her insight and judgment were fair (Tr. 275). On August 1, 2008, Plaintiff discussed her pattern of social isolation, negativity, and distrust of the world that leads to feeling sad and lonely (Tr. 337). On August 15, 2008, Plaintiff reported having evil thoughts and discussed how she felt most people in the word "need killing, so let's reduce the population" (Tr. 338). On September 5, 2008, Plaintiff was noted as being irritable and confused with fair insight and judgment (Tr. 339). On September 19, 2008, Plaintiff's affect was noted as normal (Tr. 340). Between September 19, 2008 and May 12, 2009, Plaintiff attended seven additional therapy sessions with Ms. Frances (Tr. 387, 397, 403, 408, 410, 418, 421). Her affect ranged between normal and irritable and her insight and judgment were consistently rated as fair.

### 3. Hearing Testimony

On June 15, 2010, Plaintiff testified that she stopped working on January 1, 2008, because "the medicine [she'd] been taking messes with [her] some" and that she had

stopped taking her medication November or December of 2009 but started taking Copaxone the day before her hearing (Tr. 26, 28-29). She also testified that she did not return to therapy after she stopped going in May of 2009 when she and her therapist agreed to take a break so she could spend time with her husband over the summer (Tr. 33-34).

Plaintiff lives with her husband in an apartment and they share the housework (Tr. 32). She started taking college classes in 2006 and continued to take classes through the beginning of 2010; typically six (6) credits per semester (Tr. 30 - 32). Plaintiff testified that when she was in school, she did not interact with the other students (Tr. 37). She spends her time watching TV and sleeping. Id.

Plaintiff testified that she alleged disability beginning in January 2008 because she was taking medications, she was having difficulty staying at work and being around people, and she wanted to sleep and be left alone (Tr. 38). When asked if she has problems with depression, Plaintiff responded that she breaks down and cries and she gets "mopey" (Tr. 39). Plaintiff testified to having crying spells, getting frustrated, hurting herself, having difficulty concentrating, being unable to handle stress, yelling and screaming at her husband, and having difficulty staying on task (Tr. 40-44).

Vocational expert (VE), Susan Brooks, testified that Plaintiff's past work as a fountain server was "light unskilled work with an SVP: 2"; her work as an animal control officer was "light skilled work with an SVP: 5 and is often practiced at the "medium level"; and her work as a hand packer was "medium unskilled work with an SVP: 2" (Tr. 46). Based on Plaintiff's physical and mental residual functional capacity (RFC) assessments, the ALJ posed the following hypothetical question:

Assume an individual of the Claimant's age, education, and work history.

Assume this individual has no exertional limitations. Due to mental limitations, this individual would be limited to understanding, remembering, and carrying out routine step instructions. She would be able to respond appropriately to supervisors and coworkers in jobs that do not require independent decision making. Further assume an individual who has the mental capacity to perform work where interpersonal contact is only incidental to the work performance. With these limitations, could the Claimant's past work be perfo

(Tr. 46-47). The VE responded that such an individual could perform the duties of the hand packer job (Tr. 47). The ALJ also asked if there were other light jobs that such an individual could perform at the light exertional level. Id. The VE responded that there were jobs as a cleaner in the light unskilled level with an SVP of 1 or 2 (2,400 positions in Tennessee, 370,000 in the U.S.), a stock clerk and order filler in the light unskilled level with an SVP of 2 (5,000 positions in Tennessee, 186,000 in the U.S.), and a sewing machine operator in the light unskilled level with an SVP of 2 (3,100 positions in Tennessee, 83,300 in the U.S.). Id. The VE further opined that absences two days or more per month would preclude competitive employment (Tr. 48).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th

Cir. 2007)(quoting <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994)).  Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached.  <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999).

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  <u>Id.</u> at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff first alleges that the ALJ erred in discounting as nonsevere her documented chronic plantar fasciitis/heel spur syndrome. However, this impairment is documented on only one page in the record, by an unsigned memorandum apparently faxed from Mid State Podiatry, wherein reference is made to radiographs revealing spurring and other abnormalities. (Tr. 454) The actual radiographs are not included in the record. Moreover, the author of this memorandum makes reference to plaintiff's prior history with such complaints, and that the complaints largely resolved with the use of orthotics, which plaintiff had since lost. The memorandum reflects the judgment that plaintiff's "past medical history since last visit is basically non-contributory to the chief complaint," and states that the complaint would be addressed by new orthotics, strappings, and heel lifts, as well as plaintiff's cooperation in improving her shoe gear and avoiding going barefoot. Id. The ALJ considered this piece of evidence and found that the complaint of returning foot pain when plaintiff was not using her orthotics was not sufficient to establish an impairment that was medically severe. (Tr. 13-14) The undersigned finds no error here.

Plaintiff next contends that the ALJ erred in failing to state how much weight, if any, he assigned to the opinion of Dorothy Burke, an advanced practice registered nurse who on occasion provided mental health treatment including prescription medications during plaintiff's treatment with the Volunteer Behavioral Health Care System (VBHCS). The opinion of Ms. Burke which plaintiff points to is her assessment of marked limitations in four functional domains on the Clinically Related Group (CRG) assessment form completed on July 21, 2009. (Tr. 457-59) Plaintiff casts Mr. Burke as a "treating mental health provider" (though admittedly not an "acceptable medical source" under the regulations) who "was thoroughly involved in the Plaintiff's treatment." (Docket Entry No. 7-1 at 7-8)

However, as defendant points out, the record confirms only one occasion when Ms. Burke provided mental health treatment prior to completing the CRG form -- on July 20, 2009, the day before she completed the form. (Tr. 533-34) As such, the ALJ gave this CRG form all the consideration it was due when he found plaintiff's "demonstrated activities of daily living during the same period" to be inconsistent with marked functional limitations and a Global Assessment of Functioning (GAF) score below 50, such as were found on the CRG form completed by Ms. Burke. (Tr. 16) Furthermore, the ALJ explicitly weighed the opinions behind the CRG assessment form, as follows:

> As for the opinion evidence, the record does not contain any opinions from any acceptable medical source indicating that the claimant is disabled. In July 2009, clinicians at the Volunteer Behavioral Health Care System diagnosed the claimant with bipolar disorder and assigned a GAF of 45, which generally denotes serious symptoms. However, the undersigned notes that during this time the claimant was noncompliant with her medications. Additionally, the claimant was experiencing increased stress surrounding her husband's involvement in a motorcycle accident and having to care for him. These factors likely contributed to her low GAF assessment, but the evidence does not support a finding of disabling symptoms even during this period of increased stress.

(Tr. 17) Ms. Burke was the only VBHCS clinician who saw plaintiff in July 2009. (Tr. 533-34) Accordingly, the undersigned finds no error in the ALJ's consideration of Ms. Burke's opinions and assessments.

Plaintiff further argues that the ALJ erred in finding that she did not meet or equal Listing 12.04 of the Listing of Impairments, and in failing to call a medical expert to

testify on the subject.[2]  Citing Social Security Ruling 96-6p and <u>Kelly ex rel Hollowell v.</u> <u>Comm'r of Soc. Sec.</u>, 314 Fed. Appx. 827, 830 (6th Cir. Feb. 2, 2009), plaintiff argues that the "fine distinction" of whether she meets or medically equals Listing 12.04 cannot be drawn by a layperson such as the ALJ, but must be drawn by a trained medical expert "since there was evidence of symptoms, signs and findings that obviously suggested to the ALJ that the Plaintiff's condition was equivalent to Listing 12.04[.]"  (Docket Entry No. 7-1 at 11-12) However, plaintiff is mistaken in fact and in law.  The ALJ's decision offers no support for the view that equivalence to Listing 12.04 was "obviously suggested" to him on this record. The ALJ considered the listing as he was bound to do at the third step of the sequential evaluation process, as a listing implicated by plaintiff's diagnosed impairments of bipolar disorder and major depressive disorder.  Rather than suggesting equivalence, the ALJ's view of the symptoms, signs and findings reported in plaintiff's treatment records informed his unequivocal determination that the "paragraph B" and "paragraph C" criteria of Listing 12.04 were not established.  (Tr. 14)  Other than in this scenario where the ALJ is of the opinion that equivalence is suggested on the existing record, SSR 96-6p and <u>Kelly</u> only speak to the need for an updated medical opinion in light of new evidence adduced by the plaintiff which may, in the ALJ's opinion, require a change in the state agency expert's finding that a listing was not met or equaled.  SSR 96-6p, 1996 WL 374180, at *3-4; <u>Kelly</u>, 314 Fed. Appx. at 830-

_____

[2]Plaintiff initially included within this argument Listing 12.06, regarding anxiety disorders. However, she declined to press the issue in her reply brief after defendant objected that she had failed to meet her burden of producing evidence suggesting the presence of such significant anxiety symptoms.  Although the ALJ found plaintiff's anxiety disorder to be among her severe impairments, the undersigned agrees that plaintiff has not produced significant evidence or argument as to any significantly limiting degree of anxiety symptoms.  The ALJ did not err in declining to give explicit consideration to Listing 12.06.

31. This situation does not exist here. In sum, the undersigned finds no error in the ALJ's step three finding with regard to Listing 12.04.

Finally, plaintiff argues that the ALJ erred in discounting the credibility of her subjective complaints of symptoms, in that he failed to give a sufficiently specific explanation of his reasoning and failed to recognize that plaintiff's failure to take her medications as prescribed was due to her inability to afford them and her lack of health insurance. However, the ALJ's explanation for his credibility finding is anything but conclusory, and his citation of plaintiff's failure to follow prescribed treatment is only one factor in his analysis, and a relatively minor one at that. The ALJ's reasoning, unrelated to plaintiff's failure to follow prescribed treatment, was explained as follows:

> The claimant asserts severe functional limitations from depression, bipolar disorder, and anxiety. She testified to crying spells, impaired concentration, intolerance of stress, and difficulty controlling her anger. However, her demonstrated level of functioning does not support a finding that she would be unable to sustain full time work.

> A review of the claimant's Guidance Center progress notes shows she has received marked limitations in areas with Global Assessment of Functioning (GAF) scores below 50 since the AOD (Exhibits lF; lOF; 12F). GAF scores in this range are generally indicative of serious functional limitations in several areas. However, the claimant's demonstrated activities of daily living during the same period are inconsistent with this degree of functional restriction.

> Per the claimant's testimony, she has been taking college courses since 2006 and earned approximately 58 to 62 college credit hours. Since the AOD, the claimant indicated that she has taken 6 hours of classes per semester, but stopped last February. The record indicates that the claimant earned Bs and Cs in her classes (Exhibit 1Fi21). The claimant's ability to handle college-level courses and perform well academically is inconsistent with her allegation of impaired concentration and intolerance of stress. It also erodes her credibility.

Although the claimant alleges severe depression, crying spells, and social difficulties, the record shows she maintains a very active social life. Since the AOD, the claimant has gotten married (Exhibit lOF/35). The record is replete with references to the claimant being busy with school, playing video games, or overwhelmed with studies secondary to time spent with her husband (Exhibit lOF/42, 51). In December 2008, it was noted that the claimant and Tom (husband) were enjoying various social activities eating out, taking walks, and visiting friends (Exhibit lOF/35). In January 2009, the claimant took a trip to Florida to celebrate the Christmas holiday with her family (Exhibit lOF/36). In February 2009, it was noted that the claimant wanted to go out with friends but was unable to because of school (Exhibit lOF/41). In March 2009, the claimant was learning how to ride a motorcycle and planning a trip to Georgia (Exhibit lOF/47). In October 2009, the claimant was not engaging in social activities because she was busy with school (Exhibit 12F/81).

The claimant endorsed similar activities on the Function Report. She reported transporting a friend to work, preparing meals, cleaning the home, performing household chores, caring for her pets, driving, shopping, and handling the household finances (Exhibit 6E). The performance of these activities is not inconsistent with the performance of many of the basic activities of work and shows the claimant remains more functional than one would expect for a person seeking disability.

A closer review of the medical evidence shows the claimant's symptoms are largely situational. In January 2009, the claimant reported her main stressor was school (Exhibit 10F/39). In February 2009, the claimant indicated that she felt overwhelmed by her studies because she had cut back on studying to spend more time with her husband (Exhibit 10F/42). In April 2009, the claimant reported she was stressed because of school (Exhibit 10F/74). In May 2009, the claimant reported she was out of school and no longer experiencing any stress. She stated that she no longer needed services (Exhibit 10F/52). These facts are not suggestive of a severe and disabling mental condition, but temporary increases in symptomalogy due to situational stressors.

(Tr. 16-17)

This discussion, evincing a "highly functional lifestyle" which was not

contradicted by any opinion or assessment of reduced functionality from any acceptable medical source (Tr. 17), directed the ALJ's conclusion that plaintiff was significantly limited by her symptoms but not disabled. This conclusion is consistent with the assessments of the nonexamining State agency consultants (Tr. 317-34, 347-64), as noted by the ALJ. Id. In short, the undersigned finds that the ALJ's credibility determination, which is due considerable deference on judicial review, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003), is well supported and was not arrived at erroneously.

The record in this case is admittedly conflicted, in that the mental health treatment notes reveal the therapist's, case manager's, and psychiatrist's observations of significant symptomatology addressed by the prescription of multiple medications, while also revealing plaintiff's high functioning in terms of her higher education pursuits, social outings, other daily activities, ability to travel, etc. These treatment records reveal that plaintiff appeared to manage her symptoms fairly well on a medication and therapy regime through the end of 2008, but experienced some additional turbulence beginning in January 2009, when TennCare cuts resulted in two of her medications becoming unaffordable. (Tr. 525-26) However, plaintiff continued to receive one mood stabilizing medication, and refused her providers' advice to take a different medication (lithium), not because it was unaffordable, but for fear of its potential side effects (Tr. 529) and incompatibility with pregnancy (Tr. 538). Despite the interruption of two of her medications and fluctuation in the stress caused by school, plaintiff reported that her mood was improving and her relationship stable in early 2009. (Tr. 529-32) She even discontinued her therapy sessions in May 2009, as the school semester and its associated stress had ended and she needed a mental rest. (Tr. 33-34, 510) Coinciding with her husband's medical issues following a traffic

accident in July 2009, plaintiff's symptoms worsened and an additional, anti-psychotic medication was added to her treatment. (Tr. 533-34) Plaintiff apparently struggled to comply with this new prescription regimen (Tr. 537), but in the most recent treatment note contained in the record, dated February 22, 2010 (Tr. 538), plaintiff agreed to try lithium in the face of more serious symptoms, including psychotic features. She appears to have been admitted to the emergency room for monitoring while treatment with lithium was instituted. (Tr. 29, 538)

Particularly in light of the standard of review, requiring only substantial evidence and not a preponderance favoring the Commissioner's decision, <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th Cir. 2007), the undersigned finds the decision in this case to be sufficiently supported by the record of medical and nonmedical evidence to require that it be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a

waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985);

Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).


      **ENTERED** this 11th day of December, 2014.


                s/ John S. Bryant
              JOHN S. BRYANT
              UNITED STATES MAGISTRATE JUDGE